IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | : | |
|---|---|---|
| JOSE MARROQUIN, et al., | : | |
| | : | |
| v. | : | Civil No. CCB-05-3393 |
| | : | |
| MIGUEL CANALES, et al. | : | |
| | : | |

## MEMORANDUM

Now pending before the court are plaintiffs' motion to authorize this case to proceed as a collective action and for expedited notice to prospective class members pursuant to 29 U.S.C. § 216(b) (docket entry no. 10), as well as plaintiffs' amended proposed notice plan (docket entry no. 20, Exhibit A) The issues have been fully briefed and no hearing is necessary. Local Rule 105.6. For the reasons that follow, the plaintiffs' motion will be granted and the amended proposed notice plan will be approved.

## BACKGROUND

This Fair Labor Standards Act ("FLSA")[1] action arises out of the defendants'[2] hiring of day laborers, almost exclusively Latino immigrant men of limited education, income and resources, in September and October of 2005 to perform debris removal work following

---

[1] Plaintiffs also bring these claims under the Maryland Wage Payment and Collection Law ("MWPCL") and the Maryland Wage and Hour Law ("MWHL"). *See* 29 U.S.C. § 201 *et. seq.* (FLSA); MD. CODE ANN., LAB & EMP. §§ 3-501-3-507.1 (MWPCL); *and* MD. CODE ANN., LAB & EMP.§ 3-401 *et seq.* (MWHL). 29 U.S.C. § 216(b) is the specific provision at issue in this motion.

[2] The defendants are Miguel Canales, Fredis Fermin Canales, and Alicia Canales. At all times relevant to this action, these three are alleged to have been the owners, agents, or principals of MFC General Contractors, Inc., a now forfeited Maryland corporation. Going forward, the court will refer to the defendants as "Canales."

1

Hurricane Katrina.³  Between September 9, 2005 and September 15, 2005 – and possibly over a longer period of time – defendants recruited these day laborers from various locations in Prince George's County.⁴  Apparently making multiple trips, Canales immediately transported these day laborers in vans to Mississippi to begin work.  They were hired with the understanding that they would receive free transportation and lodging and be paid $10 per hour. (*See* Def's Opp'n at p.1)  Driving through the night, plaintiffs allege that they began work upon their arrival at sun-up.  Although the accounts vary slightly, plaintiffs allege – and it appears not to be contested – that they were housed, in some cases, first in tents, and then later moved to either trailers or apartments, allegedly sleeping 12 to 16 to a trailer, four to six to a room.  (*See, e.g.,* Mot. for Exp. Notice, Ex. C, Chiroy Aff. at 11; Ex. D, Vega Aff. at 8; Ex. E, Perez Aff. at 10; Ex. F, Hernandez Aff. at 12; Ex. G, Hernandez Aff. at 11 &12; Ex. H, Leiva Aff. at 6; Ex I, Tubac Aff. at 17; Ex. J, Rodas Aff. at 14; Ex. K, Rodriguez Aff. at 18)  The work consisted mainly of debris removal from casinos and, according to the defendants, lasted until October 23, 2005.⁵  The laborers allegedly worked long days with no days off. (*See, e.g.,* Mot. for Exp. Notice, Ex. C, Chiroy Aff. at 15; Ex. G, Hernandez Aff. at 15; Ex. K, Rodriguez Aff. at 14 & 15).

---

   ³ The majority, if not all, of the work in question was performed at casinos in Saint Louis and Biloxi, Mississippi. It is alleged and disputed that some of the work was performed in locations, possibly in Louisiana, that were several hours from the site in Saint Louis, Mississippi. (*See* Mot. for Exp. Notice, Ex. D, Vega Aff. at 10; Ex. K, Rodriguez Aff. at 20).  At this stage, and in light of the court's staggering of any extensive notice plan, resolution of this dispute is not material.

   ⁴ The known recruitment and pick-up locations appear to have been the Toys R' Us and McDonald's parking lots in Langley Park, Maryland, and at the 7-11 at Kenilworth Avenue in Riverdale, Maryland.  Judging from the multiple affidavits submitted, it is possible that workers were recruited from other locations, possibly including other states.  This contention, however, is contested by Canales and, at this stage, it is not necessary to resolve this dispute.

   ⁵ That the work ended by October 23, 2005 is also contested. (*See, e.g.,* Mot. for Exp. Notice, Ex. C, Chiroy Aff. at 17; Ex. F, Hernandez Aff. at 18)

The named plaintiffs, thirty-seven of these day laborers, filed this collective action on behalf of themselves and similarly situated individuals, claiming defendants failed to pay the federal minimum wage and overtime, and failed to advise the workers of their rights as required under the FLSA and Maryland law. It is alleged that defendants made no mention of – nor paid – any overtime, and that many of the paychecks bounced.[6] The parties generally agree that the entire potential class consists of approximately 150 laborers. The parties do not agree, however, on the current location of, or how difficult it will be to identify, the approximately 113 unidentified and allegedly aggrieved individuals. Nor do they agree on the means necessary to identify and adequately notify them of this action. The preliminary issues to be addressed, then, are whether proceeding as a collective action and providing court approved notice to potential class members are appropriate.[7]

## ANALYSIS

Title 29 U.S.C. § 216(b)[8] establishes an "opt-in" scheme whereby potential plaintiffs

---

[6] A portion of many of the plaintiffs' pay was sent directly to their families in Central and South America. Some of the plaintiffs aver that this money was in fact received. (*See, e.g.,* Mot. for Exp. Notice, Ex. E, Perez Aff. at 15; Ex. G, Hernandez Aff. at 16) Nearly all of the affiants, however, also report that they received little to nothing else, or that the paychecks that were received bounced. Since the initiation of this suit, some additional payments have been made and plaintiffs' first amended complaint reflects these $36,947 in payments, the crediting of which reduces plaintiffs' claims to $295,303 pursuant to the MWPCL and MWHL, and to $103,837,29 pursuant to the FLSA.

[7] As addressed below, the same legal standards apply for assessing the appropriateness of both proceeding as a collective action and providing court approved notice to potential class members.

[8] 29 U.S.C. § 216(b) reads, in pertinent part, as follows:

An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No

must affirmatively notify the court of their intention to become a party to the collective action. To effectuate the remedial purpose of the act, it is well settled that district courts have the discretion, in appropriate cases, to allow such claims to proceed as a collective action and to facilitate notice to potential plaintiffs. *See Camper v. Home Quality Management Inc.*, 200 F.R.D. 516, 519 (D.Md 2000)(citing *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989).[9] The question is whether such a collective action and notice are appropriate in this case.

While the inquiry at this stage is less stringent than the ultimate determination whether the class is properly constituted, *see Jackson v. New York Telephone Co.*, 163 F.R.D. 429, 431 (S.D.N.Y. 1995), and is often articulated as requiring only a relatively modest factual showing, *see D'Anna v. M/A-Com, Inc.*, 903 F.Supp. 889, 894 (D.Md. 1995), mere allegations in the complaint are not sufficient. *See Camper*, 200 F.R.D. at 519. An adequate factual showing by affidavit, however, may suffice to show that a similarly situated group of potential plaintiffs exists. *See id.*; *see also Realite v. Ark Restaurants Corp.*, 7 F.Supp.2d 303, 307-08 (S.D.N.Y.1998)(holding that ten affidavits submitted by plaintiffs alleging failures to pay overtime or use time clocks or sign-in sheets constituted a sufficient factual showing). A group of potential plaintiffs are "similarly situated" when they together were victims of a common policy or scheme or plan that violated the law. *See Jackson*, 163 F.R.D. at 432.

First, the plaintiffs have made an adequate showing that there were other yet-unidentified

---

employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought. The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.

[9] Court facilitated notice may be especially important in cases such as this, involving migrant workers, to ensure that the rights intended to be protected under the FLSA are in fact protected. *See, e.g., Riojas v. Seal Produce, Inc.,* 82 F.R.D. 613, 619 (S.D.Tex. 1979).

co-workers in the same position.[10] Moreover, Canales does not contest that this is the case.[11] The fact that there are, at least, approximately 113 unidentified co-workers who were in the same position weighs heavily in favor of allowing this case to proceed as a collective action and allowing a notice plan to move forward.[12] Second, plaintiffs have put forth adequate evidence

---

[10] The named plaintiffs, at least those submitting affidavits, seem to be limited to those who were recruited from popular day labor sites in Prince George's County and transported on or around September 9, 2005 and September 15, 2005. Plaintiffs, however, through sworn affidavits, have provided consistent testimony that other workers arrived separately, and possibly from other locations. For example, plaintiffs aver that several workers – whom they had reason to believe also worked for the defendants – were already at the various locations when they arrived, some having told plaintiffs that they had been working for the defendants for three weeks. (*See, e.g.,* Mot. for Exp. Notice, Ex. C, Chiroy Aff. at 10 & 14; Ex. F, Hernandez Aff. at 12; Ex. G, Hernandez Aff. at 11; Ex I, Tubac Aff. at 14) Another plaintiff avers that one of the defendants told him that "they already had a lot of people there, but they needed more." (*See* Mot. for Exp. Notice, Ex. C, Chiroy Aff. at 5) Plaintiffs also state that, during their tenure on the job, other groups of workers arrived and departed at varying times. (*See, e.g.,* Mot. for Exp. Notice, Ex. E, Perez Aff. at 12; Ex. F, Hernandez Aff. at 14; Ex I, Tubac Aff. at 18; Ex. J, Jodas Aff. at 15) Plaintiffs further aver that there were many more workers than just those with whom they traveled from Maryland, that they knew very few of their co-workers, and that they believed some to be from other parts of the country, such as Houston, Texas. (*See, e.g.,* Mot. for Exp. Notice, Ex. C, Chiroy Aff. at 16; Ex. D, Vega Aff. at 8 & 14; Ex. E, Perez Aff. at 10 & 18; Ex. F, Hernandez Aff. at 12; Ex. G, Hernandez Aff. at 11 & 14; Ex. K, Rodriguez Aff. at 19) Moreover, the numbers of perceived co-workers cited by the various affiants are generally consistent with each other and with those claimed in the plaintiffs' filings. Judging by their accounts, it seems reasonable that there were at least the 150 similarly situated workers claimed by the plaintiffs. The sworn testimony of one affiant puts the number of fellow employees at closer to at least 200. (*See* Mot. for Exp. Notice, Ex. H, Leiva Aff. at 6)(stating that there were 13 people per trailer and 16 trailers at one site alone). In any event, regardless of the accuracy of these affiants' perceptions, the parties agree on the approximate total universe of potential claimants.

[11] Canales agrees that there were approximately 150 recruited workers and has recently provided plaintiffs with records listing many, if not all, of these workers. Significantly, however, these records do not contain addresses or other contact information for these individuals. As discussed below, defendants have agreed to attempt to locate as many of these individuals, or addresses for as many of these individuals, as possible. Defendants do not believe, however, that they will be successful in locating more than approximately half of the missing class members. In fact, defendants stated, in a conference call with the court, that possibly no more than twenty of the missing class members provided them with addresses in the first place.

[12] Again, plaintiffs' contention that co-workers were recruited and arrived from areas outside of the Maryland-Washington, D.C. area is disputed by Canales. Canales explains that

that the day laborers working for the defendants were subjected to the same FLSA violations.[13]
For example, one plaintiff avers that, immediately upon arrival, one group of workers told him that they had already been working for three weeks and had not been paid at all. (*See* Mot. for Exp. Notice, Ex. C, Chiroy Aff. at 10)  Moreover, the submitted affidavits consistently tell of underpayment, unpaid overtime, and bounced paychecks.[14]  While courts often find the presence of a company-wide policy as key to the approval of court facilitated notice, *see D'Anna*, 903 F.Supp. at 894, here, plaintiffs cannot reasonably be expected to have evidence of a stated policy of issuing bad checks or refusing to pay overtime.[15]

Third, plaintiffs also have demonstrated that there likely are class members who are not presently in the Prince George's County area, and who, whether or not they are still in that area, would be difficult to contact.[16]  For example, plaintiffs aver that they are aware of how to contact

---

plaintiffs may be confused on this point because they may have met other workers at the job sites who were actually recruited by, and working for, other companies. The notice plan the court will approve at this point does not require resolution of this dispute. Moreover, the parties nevertheless agree on the approximate total number of potential claimants.

[13] It also appears to be uncontested that the workers in defendants' employ performed the same work and lived under generally the same conditions.

[14] Plaintiffs' amended complaint notes that defendants have, in part, compensated the plaintiffs for the bad checks received by issuing replacements. *See* note 6, *supra*.

[15] Plaintiffs have, however, put forth adequate evidence that defendants may have a practice of not having their workers complete any formal paperwork, thus creating an environment where the alleged abuses are more possible. Nearly every affiant reports that defendants never had them fill out any application or other paperwork. Indeed, counsel for Canales concedes that the information collected on these laborers, copies of which have apparently been provided to the plaintiffs, does not include addresses or other identifying information beyond their names. It should be noted that defendants stress that the laborers themselves do not provide, and in some cases may not have, further identifying information.

[16] The court is mindful that whether these potential plaintiffs will ultimately be difficult to contact – and thus whether more extensive outreach efforts are justified – depends in part on the success of the defendants' promised additional efforts to locate better information on their

only a few of their co-workers from the job in question and that they believe many returned to other states, such as Kentucky, Missouri, and Texas, or their respective home countries, such as Mexico. (*See, e.g.,* Mot. for Exp. Notice, Ex. C, Chiroy Aff. at 16; Ex. D, Vega Aff. at 14; Ex. E, Perez Aff. at 12 & 17; Ex. F, Hernandez Aff. at 12 & 15; Ex. G, Hernandez Aff. at 20; Ex. H, Leiva Aff. at 13; Ex I, Tubac Aff. at 17 & 19; Ex. J, Rodas Aff. at 21; Ex. K, Rodriguez Aff. at 22)  Moreover, several of the named plaintiffs testified that they themselves have changed apartments and phone numbers since returning from Mississippi. (*See, e.g.,* Mot. for Exp. Notice, Ex. C, Chiroy Aff. at 18; Ex. E, Perez Aff. at 16; Ex. F, Hernandez Aff. at 19; Ex. G, Hernandez Aff. at 19; Ex. J, Rodas Aff. at 20) Plaintiffs also are fairly consistent in their testimony that the defendants never had them complete any official paperwork which might contain reliable contact information, but rather only collected names for a daily "roll-call."[17]  It is clear that some outreach efforts may be necessary to provide adequate notice to the potential class members.[18]

      Thirty-seven named plaintiffs seek to represent what is, by plaintiffs' own account, a

---

whereabouts, as well as the success of the limited outreach the court approves today. As further explained below, the court is therefore allowing the defendants additional time to see how many of the class members it can identify before more extensive outreach is considered.

[17] Plaintiffs also cite studies of migrant worker populations verifying that such frequent changes of addresses and contact information are commonplace. (*See* Mot. for Exp. Notice at notes 2-6) These studies, however, were not considered in reaching the conclusion here today.

[18] There is some disagreement between the parties as to the extent of the dispersion of the approximately 150 laborers since the completion of post-Katrina work. Defendants believe that the vast majority remained in the Prince George's County area. Defendants do note, however, that they have heard rumors of an Immigration and Customs Enforcement "sting" which may have resulted in the deportation of some number of these laborers. Nevertheless, the defendants are adamant that there are not class members widely dispersed. The plaintiffs, however, contend they have reason to believe that many have returned to other parts of the United States and, in some cases, to their countries of origin. The staggered nature of the approved notice plan will allow for resolution of this particular dispute to be delayed pending the results of the initial, more geographically tailored, notice effort.

class of only approximately 150 potential plaintiffs. While the relatively small number of "missing" plaintiffs does not affect the court's view that an adequate factual showing for proceeding as a collective action has been made, it does suggest that a more limited notification plan, which could be expanded as needed, is appropriate.[19] To that end, the court finds that the plaintiffs' amended proposed notice plan provides a reasonable starting point. The amended notice plan ("the plan") will be approved in its entirety. (*See* docket entry no. 20, Exhibit A) As a preliminary matter, defendants should, pursuant to the June 21, 2006 conference call with the court, already be making efforts to locate as many laborers as possible. Defendants should provide the court with a status report on these efforts by July 21, 2006. The success of these efforts, along with the initial notice efforts authorized today, may limit or eliminate the need for more extensive notification.

In the meantime, an initial phase of notification may begin. The court approves plaintiffs' amended proposed notice plan in its entirety. Additionally, to the extent residential addresses for any of the potential class members are located, direct mailings to those individuals

---

[19] The defendants complain of the prejudice they would suffer from wide advertisement of this lawsuit. While it is true that courts must "avoid the 'stirring up' of litigation through unwarranted solicitation," and employers "should not be unduly burdened by a frivolous fishing expedition," *see D'Anna*, 903 F.Supp. at 894, the notification plan approved here today is tailored in such a way so as to not unduly burden the defendants. The defendants also argue that the group of potential plaintiffs is a known, identifiable quantity and that no other laborers have complained to them about their pay. As to the first contention, there are enough factual disputes between the parties, as well as enough evidence that defendants maintained poor to non-existent records, to warrant scrutiny and some notification efforts. Having not maintained adequate records of their workers, as is required by law, defendants are not in a strong position to oppose the reasonable notice efforts proposed and approved herein. As to the latter contention, that no other laborers have complained is not dispositive. The point of such a notice regime is, at least in part, that potential plaintiffs may be unaware of their rights, or that there is any mechanism through which they could reasonably expect to have those rights vindicated. *See Riojas,* 82 F.R.D. at 619.

is also authorized.[20] At this stage, the plan remains geographically limited, except in the instances where plaintiffs have reliable information that a particular potential plaintiff or plaintiffs can be notified at a particular out-of-area address.[21] This notification effort is warranted in light of the testimony produced, the importance of adequate notification in an "opt-in" regime such as this, the nature of this population and the defendants' apparent failure to maintain adequate records. Based on the foregoing, this case may proceed as a collective action, and notification, pursuant to the amended proposed notice plan and attached order, is authorized.

A separate order follows.

| June 30, 2006 | /s/ |
|---|---|
| Date | Catherine C. Blake |
| | United States District Judge |

---

[20] As part of the direct mail effort, defendants should of course provide plaintiffs with any discovered additional contact information for the laborers in question. Mailings to the individual workers and any known workers' families is appropriate, including to their home countries where there are verifiable addresses and some reason to believe the potential class member either has relocated there or has no other possible mailing address.

[21] Plaintiffs' originally submitted plan was far more extensive and costly. (*See* Mot. for Exp. Notice, Ex. B, Budget) This included sending notices to 21 community, health and medical centers in Maryland, 27 day labor hiring centers throughout the United States, and 45 foreign consulates. Additionally, plaintiffs proposed the running of print media ads in 15 newspapers around the country, and the production of radio and television spots to be aired as public service announcements on 10 radio stations in multiple states, and the Univision and Telemundo television channels in Silver Spring.