## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JOSE MARROQUIN, *et al.*                    :

                                         :

                                         :

      v.                    :            Civil No. CCB-05-3393

                                         :

MIGUEL CANALES, *et al.*                    :

                                         :

                                         :

## **MEMORANDUM**

Plaintiff Jose Marroquin, on behalf of himself and a class of co-workers, and plaintiff Jose Sales claim damages in a collective action filed against their employers Unlimited Restoration, Inc. ("URI"), MFC General Contracting, Inc. ("MFC"), and Miguel Canales[1], Fredis Canales, and Alicia Canales individually.  The plaintiffs allege the defendants failed to pay them full wages for construction work in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 206-07, Maryland Wage Payment and Collection Law, Md. Code Ann., Lab & Empl. §§3-501-3-509 (2006), and the Maryland Wage and Hour Law Md. Code Ann., Lab & Empl. §§ 3-401-3-431 (2006).  Currently pending are: 1) the plaintiffs' combined motion for summary judgment, 2) plaintiff Jose Sales's motion for summary judgment, 3) defendant URI's motion for partial summary judgment, and 4) defendant Alicia Canales's motion for summary judgment.  For the reasons that follow, I will grant the plaintiffs' motion in part and deny it in part; grant Jose

---

[1] Miguel Canales also refers to himself as Michael Canales, and his deposition was taken under the name Michael Canales.  For ease of reference, I will refer to him as Miguel Canales throughout the opinion.

Sales's motion; deny without prejudice URI's motion; and grant Alicia Canales's motion.

## BACKGROUND

In the wake of Hurricane Katrina's destruction in September 2005, URI entered into an agreement with MFC, a Maryland employer, whereby MFC would perform cleaning and restoration services at Casino Magic in Bay Saint Louis, Mississippi, Boomtown Casino in Biloxi, Mississippi, and WDSU Radio in Louisiana.  (Miguel Canales's Answer to Pl.'s Interrogs. at # 8.)  To perform the work, Fredis and Miguel Canales, working for MFC, recruited and hired the plaintiffs, who were day laborers residing in Maryland.  (*See id.* at 2; Pl.'s Mem. at App., Fredis Canales Dep. at 73-74.)  MFC drove the approximately forty-five plaintiffs in passenger vans from Maryland to Mississippi.  (Pl.'s Mem. at App., Fredis Canales Dep. at 73-74.)  The plaintiffs' work in the Gulf Coast consisted of demanding physical labor, including the clearing of large debris, salvaging of furniture and gambling machines, and cleaning of refrigerators filled with rotting food.  (*See, e.g., id.*, Garcia Decl. at ¶¶ 6-8.)  Some of the plaintiffs were housed in trailers at the Casino Magic worksite, while others were housed in Daphne, Alabama, approximately two hours from the Boomtown casinos and the Louisiana worksite.  (*See id.*, Miguel Canales Dep. at 119; Miguel Canales's Answer to Pl.'s Interrogs. at # 8.)

According to both parties, MFC offered to pay plaintiffs a wage of $10 per hour.[2]   In

---

[2] URI and MFC agreed that URI would pay MFC $20 per hour for non-skilled workers and $25 per hour for skilled workers.  (Pl.'s Mem. at App., Miguel Canales Dep. at 108.)  It appears that while URI paid for and arranged the trailers and apartments where the plaintiffs lived, URI was not involved in the decision to pay the plaintiffs $10 per hour.  Additionally, URI did not write the plaintiffs' paychecks.  (Pl.'s Mem. at App., Miguel Canales Dep. at 120.)

addition, it was agreed that MFC would provide the plaintiffs with food and lodging while they

worked in the Gulf Coast region.[3]   The parties disagree, however, about whether MFC would pay

the plaintiffs overtime or deduct the cost of the plaintiffs' food and lodging from their wages.

When asked what MFC told the plaintiffs about the pay in Mississippi, Miguel Canales testified:

> "About the pay in Mississippi? $10 an hour.  They could come work $10 an hour, and
> told them what was included.  We pay for the housing, you know, the food, you know,
> there would be lunch, their lunch.  That was it, you know. My dad would talk to them ...
> if they wanted to get either the food or if they wanted to get their overtime paid ... and
> mostly everybody worked for food.  Everybody worked for food, because it was ... more
> to their benefit."

 (Pl.'s Mem. at App., Miguel Canales Dep. at 120-21.)  The plaintiffs claim that MFC never

advised the plaintiffs that the food or lodging would affect the plaintiffs' pay in any way, nor

were they given the choice between food and overtime pay.  (*See, e.g., id.*, Garcia Decl. at ¶¶ 3-

5; Luna Decl. at ¶¶ 3-5.)  MFC states that they had employed many of the plaintiffs in previous

projects and those individuals knew that MFC did not pay overtime in those projects and would

not pay overtime in the Gulf Coast.  (*Id.*, Miguel Canales Dep. at 122-24.)  In any event, the

plaintiffs were not paid overtime for any hours they worked over 40 hours per week, though

some were periodically given $100 per week in funds to purchase incidentals and extras not

provided by the company.[4]  (*Id.*, Miguel Canales's Answer to Pl.'s Interrogs. at # 3.)  The

---

[3] The workers were housed in small apartments or trailers.  Jose Sales described the apartment he lived in:
> It had one bedroom, which was basically the living room, one bathroom, and a kitchen.  5
> of us stayed in this apartment.  2 people slept in a bed, 1 person slept on the sofa, and 2
> others slept on the floor.  I slept on the floor for practically the entire time.

 (*Id.*, Jose Sales Answer to Def.'s Interrogs. at # 9.)

[4]At oral argument, MFC admitted it has no records or receipts of who was paid the $100/week or how often it was paid.

plaintiffs also were not paid for the time spent traveling from their temporary homes to the worksites.

The MFC supervisors, Wilson Maldenado at Casino Magic and Ronnie Rodriguez at Boomtown, were responsible for recording the hours that each worker worked on a daily time sheet.  These time records were produced to the plaintiffs in discovery.  (*Id.*, Ronnie Rodriguez Dep. at 74-80.)  MFC did not produce any time sheets for the work performed by the plaintiffs in Louisiana, where the plaintiffs claim five plaintiffs worked for approximately eleven days.  MFC completed the work at the Boomtown Casino before completing the Casino Magic project, and it shifted the workers who were working on the Boomtown Casino project to the Casino Magic project; the workers on these projects continued to reside in Daphne, Alabama, however, and continued to keep commutes of approximately four hours each day.  The defendants did not offer these plaintiffs an option of living closer to the Casino Magic worksite, and the plaintiffs did not have any other mode of transportation.  (*Id.*, Ronnie Rodriguez Dep. at 69.)  The plaintiffs claim they would have welcomed the chance to live closer to their worksite and to work during the hours they spent commuting.  (*Id.*, Ronnie Rodriguez Dep. at 84; Jose Sales Decl. at ¶ 15.) Those workers commuting from Daphne worked 1-2 hours fewer per day than those workers who lived on-site.

The plaintiffs' last day working in the Gulf Coast region was October 22, 2005.  They allege MFC representatives told several of the plaintiffs there was no more immediate work, but more work might become available in the next day or so.  (*See* Pl.'s Mem. at App., Luna Decl. at ¶ ¶ 12-14; Campos Resp. to Miguel Canales Interrogs. at # 4.)  Some of the plaintiffs waited for the work, while others took a bus on October 24, provided for by the defendants.  (*Id.*, Catalino

4

Rivera Answer to Def.'s Interrogs. at # 14.; Arnaldo Vasquez Answer to Def.'s Interrogs. at 14.)

In their affidavits, the defendants do not specifically refute the claim that they asked the

plaintiffs to wait for more work.  The defendants did not engage the plaintiffs to do further work

and transported the plaintiffs back to Maryland a few days later.  (*Id.*, Luna Decl. at ¶¶ 12-13;

Alejandro Rodriguez Answer to Def.'s Interrogs. at # 14.)

Upon their return to Maryland, according to the plaintiffs, the defendants refused to

properly pay them for all of their time worked.  The plaintiffs claim that, in addition to not

paying them overtime, MFC did not fully pay them for the undisputed hours they worked each

week.  To calculate the amount of money owed, the plaintiffs hired an accountant, Michael

Kresslein, who prepared a report for this case.  In making his determinations about what the

plaintiffs are owed, Kresslein relied on the plaintiffs' timesheets, wire transfer records, and the

plaintiffs' and defendants' interrogatory responses and affidavits.  (*Id.*, Kresslein Decl. at App.

II.)  Kresslein separated the total salary owed and due to the plaintiffs into three categories: work

time, travel time, and on-call time.[5]  The three categories totaled $75,490.50 in unpaid wages

($47,585.50 in work time, $23,425.00 in travel time, and $4480.00 in on-call time), which would

amount to $226,471.50 if the entire amount were subject to trebling under the Maryland Wage

Payment and Collection Law.  (*Id.,* Kresslein Supp. Rep. at ¶ Ex. A.)[6]

---

[5] Travel time was calculated as the time the plaintiffs residing in Daphne, Alabama spent traveling from their trailers and apartments to their worksites.  The time spent on-call constitutes the days between the plaintiffs' last day working and the day they were transported back to Maryland, where the plaintiffs contend they were told by the defendants that more work might be coming.  (*Id.* at ¶ 8.)

[6] Kresslein's calculations in Exhibit A of his supplemental report appear to be slightly inconsistent.  Kresslein calculated that the plaintiffs earned $133,347.50 in work time, $23,425.00 in travel time, and $4,480.00 in on-call time, which adds to a total salary of

The defendants produced the Preliminary Expert Report of lawyer Philip Zipin, who also calculated what the plaintiffs are owed.  In coming to his conclusions, Zipin relied on conversations with the defendants' counsel, review of the complaint, the plaintiffs' time records, and Kresslein's expert report.  In his capacity as a lawyer, Zipin examined the Fair Labor Standards Act and determined the plaintiffs should not be paid for any travel time or on-call time.[7]  (*Id., Zipin Rep. at 3.*)  Zipin further concluded the FLSA allows the defendants to offset overtime wages with certain types of expenses, such as board and lodging if customarily furnished, which the defendants claim they provided here. Zipin, however, did not credit any offsets in his report, explaining he did not have the proper documentary evidence to allow offsets.  (*Id.*)  Included in his calculations was pre-judgment interest owed to the plaintiffs on unpaid wages, but not treble damages.[8]  Zipin calculated the defendants owe the plaintiffs $44,159.50, before pre-judgment interest.  (*Id.* at Zipin Rep.)

In addition to refusing to properly pay the plaintiffs, MFC allegedly issued several checks, totaling $52,166.00, which the plaintiffs were unable to cash due to insufficient funds in MFC's checking account.  (*Id.*, Salisbury Decl. at ¶ 10.)  After demands that the money be paid to the plaintiffs, Richard O'Connor, counsel for the defendants, hand-delivered replacement

---

$161,252.50.  In his amended report, however, Kresslein states that the total salary earned by the plaintiffs was $165,300.00.  Because this discrepancy does not appear to be explained in his report, I will take the $161,252.50 to be the  amount that plaintiffs claim they earned in total salary.  (Kresslein Supp. Rep. at Ex. A.)

[7] The plaintiffs note that, while Zipin examined the FLSA provisions as to travel and on-call time, the plaintiffs base their claims on state law and not the FLSA.  Zipin's report does not specifically address Maryland law on either issue.  (*Id.*, Zipin Rep.)

[8] Also not included in Zipin's calculations were any additional wages due to Jose Sales for work performed before the Mississippi clean up work performed by the plaintiffs, because Zipin did not have Sales's daily time sheets for those days.  (*Id.*, Zipin Rep. at 5.)

6

checks totaling $36,947.00 to an attorney for the plaintiffs.  (*Id.*, Salisbury Decl. at ¶ 11.)  The defendants have allegedly not replaced the other $15,219.00 of bad checks owed to seven plaintiffs.  (*Id.*, Salisbury Decl. at ¶ 12.)  The plaintiffs argue that defendants' refusal to pay the plaintiffs' full wages constitutes bad faith, which justifies a trebling of damages under Maryland law.

In December 2005, the plaintiffs filed a complaint against MFC and Miguel, Fredis, and Alicia Canales alleging violations of the Fair Labor Standards Act, Maryland Wage Payment and Collection Law, Maryland Wage and Hour law, and breach of contract.  The plaintiffs subsequently amended their complaint in May and July 2006, adding URI as a defendant, correcting the number of plaintiffs in the suit, and adding on-call time to their claims.  After discovery, the plaintiffs collectively, and Jose Sales individually, moved for summary judgment.[9] The plaintiffs argue the evidence demonstrates the defendants did not pay full wages, overtime wages, travel time, or "on-call" time, and acted in bad faith entitling the plaintiffs to treble damages.  The plaintiffs seek $226,471.50 before prejudgment interest.

In addition to the plaintiffs' motion for summary judgment, URI filed a motion for summary judgment against MFC and the individual defendants.  In its motion, URI claims that it reached a settlement agreement with the plaintiffs, where URI agreed to pay the plaintiffs $100,000.00.  URI argues that prior to the work at issue in this case, it entered into a contract with MFC, in which MFC agreed to indemnify URI and hold it harmless from claims asserted by MFC employees.  URI further argues that because its involvement in this case is due solely to

---

[9] Sales is in a different position from the other plaintiffs because he is making claims for unpaid work arising from work performed between July and September 2005 as well as claims arising out of work performed in the Gulf Coast region.  (*See* Sales Mot. at 2, Ex. 1.)

plaintiffs' theory of joint employment, MFC would be obligated to indemnify URI even without

a prior agreement.  Accordingly, URI moved for summary judgment for $100,000.00 - the

amount that it agreed to pay the plaintiffs in settlement.

Lastly, the defendants on behalf of Alicia Canales filed for summary judgment.  Alicia

Canales argued that because she is not an employee or an officer of MFC, and only incidentally

performed ministerial duties for MFC, she should not be sued individually in this case.  The

defendants contend Ms. Canales has no involvement in the operation of the company and no

evidence exists reflecting that Ms. Canales violated any employment statute.

## ANALYSIS

I.      Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment:

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if any, show that there is no genuine issue
> as to any material fact and that the moving party is entitled to a judgment as a matter of
> law.

The Supreme Court has clarified this does not mean that any factual dispute will defeat the

motion:

> By its very terms, this standard provides that the mere existence of *some* alleged
> factual dispute between the parties will not defeat an otherwise properly
> supported motion for summary judgment; the requirement is that there be no
> *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

8

showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## II      The Plaintiffs' Motion

Maryland employers are required to pay their employees "all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated." Md. Code Ann., Lab. & Empl. § 3-505 (2006). In addition, Maryland law requires the payment of "an overtime wage of at least 1.5 times the usual hourly wage" for "each hour over 40 hours that an employee works during 1 workweek." *Id.* at § 3-415(a), § 3-420(a). If "a court finds that an employer withheld the wage of an employee ... and not as a result of a bona fide dispute, the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs." *Id.* at § 3-507(b)(1).

The parties disagree about three primary issues regarding plaintiffs' motion: 1) the amount plaintiffs are due in wages and whether defendants are entitled to offset any of plaintiffs'

overtime wages; 2) whether the plaintiffs should be paid for travel time; 3) whether the plaintiffs

should be paid for "on-call" time.  Each will be discussed in turn.

A.      Wages and Offsets

In its briefs, MFC argued the plaintiffs should not be paid overtime for their work in the

Gulf Coast because the plaintiffs orally waived any right to overtime, a claim that was disputed

by the plaintiffs.  At oral argument, however, MFC backed off that claim and now does not

dispute that the plaintiffs deserved to be paid overtime for the time worked over forty hours a

week.  MFC continues to argue, however, that the plaintiffs should have their overtime pay

offset by the money provided by MFC to the plaintiffs for food.

Maryland law provides that "an employer may include, as part of the wage, the cost that

the employer incurs in providing the advantage to the employee"; advantages are defined to

include board and lodging.  Md. Code Ann., Lab. & Empl. §3-418.  At oral argument, MFC

conceded it did not have proper documentation showing the cost of board and lodging, and does

not seek to have the food or housing provided for the plaintiffs offset.  MFC does claim,

however, that it provided the plaintiffs $100 per week to purchase food, and contends it is

entitled to offset its overtime wages by that $100 per week.

The defendants are not entitled to offsets for several reasons.  The Code of Federal

Regulations require "an employer who makes deductions from the wages of employees for

'board, lodging, or other facilities' ... shall maintain and preserve records substantiating the cost

of furnishing each class of facility." 29 C.F.R. § 516.27(a); *see also Donovan v. Williams Chem.*

*Co.*, 682 F.2d 185, 189 (8th Cir. 1982) ("It is the burden of the company to prove the reasonable

cost of the lodgings by producing records or other credible evidence."); *Donovan v. New*

*Floridian Hotel, Inc.,* 676 F.2d 468, 474 (11th Cir. 1982); *Brock v. Carrion, LTD*, 332 F. Supp.

2d 1320, 1325 (E.D. Cal. 2004).  Courts, including this one, have found that where defendants

have produced no records concerning the costs of facilities, they forfeit the ability to deduct the

cost of the facilities.  *See Bueno v. Mattner*, 633 F. Supp. 1446, 1453 (W.D. Mich. 1986), *aff'd*

820 F.2d 1380 (6th Cir. 1987) (holding that defendant was not entitled to credit for housing

provided to migrant workers, where the defendant provided no evidence concerning the value of

the housing); *Leonard v. Carmichael Properties* & *Mgmt. Co., Inc.*, 614 F. Supp. 1182, 1187-88

(D.C. Fla. 1985) (same); *Fields v. Luther*, 1988 WL 59963 at *15 (D. Md. 1988) (farm labor

contractor not permitted to deduct gas and electricity from workers' wages where the only

evidence presented as to cost of utilities were average monthly benefits).

The defendants are not entitled to offsets under federal law.  The defendants have

produced no records that show when and how often the plaintiffs were paid the $100 per week.

No receipts or records of the payments were provided to the court, nor was any explanation

given of how the $100 was distributed to the plaintiffs.  Indeed, Mr. Zipin, the defendants' own

expert, did not include offsets in his calculation of the plaintiffs' wages, though he had the

deposition testimony of the plaintiffs and the Canales defendants.  Because the plaintiffs contend

they were not regularly paid the $100 per week, because the defendants did not provide any

documentation of the offsets, and because Mr. Zipin conceded that plaintiffs' wages should not

be offset, no offsets will be allowed under federal law.[10]

---

[10]In his expert report, Mr. Zipin "reserved the right to amend [his] report at the
appropriate future time" if further evidence became available.  (*Id.* at Zipin Rep.)  Months later,
Mr. Zipin has not updated his report.

The defendants fare no better under Maryland law.  While defendants are allowed to include, as part of the wage, board and lodging under § 3-418(b), an employer is not allowed to make deductions from the wage of an employee unless, *inter alia*, it is authorized in writing by the plaintiffs.  Md. Code. Ann., Lab. & Empl. §3-503 (2006).  Here, there is an allegation that the plaintiffs orally accepted the food and lodging instead of overtime pay, but the defendants do not claim they ever obtained that consent in written form.  In fact, Miguel Canales appears to concede that the $100 per week was not part of the plaintiffs' regular wage, and that he told the plaintiffs the food allowance was in addition to the $10 an hour they would receive.  (Pl.'s Mem. at App., Miguel Canales Dep. at 121-22.)  Without written authorization, the defendants are not allowed to take the offsets for food and lodging under Maryland law.

The major difference between Mr. Kresslein and Mr. Zipin's reports was the issue of offsets.  Without offsets, Zipin claims that the plaintiffs are owed $44,159.50, while Kresslein claims the plaintiffs are owed $47,585.50.  The difference between the two experts appears to be mostly limited (with some minor discrepancies in the calculation of some of the plaintiffs' hours) to pay owed to two plaintiffs - Francisco Aguilar and Estuardo Marroquin - who were added in the plaintiffs' amended complaint.  Kresslein updated his report on January 29, 2007 to reflect Aguilar and Marroquin's pay; he calculated they earned $5,815.00 in work time and were paid $2,200.00.  (*Id.,* Kresslein Supp. Rep. at Ex. A.)  Zipin did not update his report to include the hours worked, though Kresslein included the time sheets for both Aguilar and Marroquin.  (*Id.*, Kresslein Supp. Rep. at Ex. B.)  Because the plaintiffs submitted the time reports of Aguilar and Marroquin and the defendants have not specifically objected to, or provided evidence to contradict, Kresslein's numbers for Aguilar and Marroquin, I will accept the plaintiffs' analysis

of the disputed $3,400.00.  Accordingly, I will grant summary judgment for the plaintiffs for the

sum of $47,585.50 on the issue of worktime and overtime.  Attorneys' fees and costs will be

determined at the conclusion of the case.

B.      Travel Time

The plaintiffs argue that travel time spent by the plaintiffs housed in Daphne, Alabama

(27 of the 45 plaintiffs) should be counted as time worked.  Those workers housed in Daphne

spent approximately four hours each day commuting to and from work, while others of the

plaintiffs were provided housing at or near the worksites.  The plaintiffs base their claim for

travel time being compensable on Maryland state law, which provides "'Hours of work' means

the time during a workweek that an individual employed by an employer is required by the

employer to be on the employer's premises, on duty, or at a prescribed workplace."  Md. Code

Regs. 09.12.41.10(A).  The Code further specifically states "Travel time is included in

computing hours of work if the individual: 1) travels during regular work hours, 2) travels from

one worksite to another; or 3) is called out after work hours in emergency situations."  Md. Code

Regs. 09.12.41.10(C).  The parties were unable to find Maryland case law interpreting

Regulation 09.12.41.10(A).  Case law exists interpreting the travel time regulations under the

FLSA, but plaintiffs bring this claim under Maryland law.

The plaintiffs claim that their daily travel time should be compensated because it

occurred during regular work hours.  Plaintiffs who lived at the Casino Magic worksite worked,

on average, from 7:30 a.m. to 6:30 p.m., while employees housed in Daphne were only able to

work from 7:00 a.m. to 4:00 p.m. due to the time spent commuting.  (*See*  Pl.'s Mem. at App.,

Ronnie Rodriguez Dep. at 84-85.)   The plaintiffs alternatively argue they were "on duty"

because they were required by MFC to gather between 5:00 and 6:00 a.m. every morning.  The defendants argue they had no choice but to house those workers in Daphne because there was no housing closer to the worksites.

Given that no Maryland case law on the issue appears to exist, an examination of federal case law may be instructive, though the statutes are not entirely parallel.  Under the FLSA and the Portal Act, time spent in ordinary home-to-work travel does not count as time worked, unless it is performed as an integral and indispensable part of the principal activity, or where there is a custom, contract, or practice to treat the travel as compensable.  29 U.S.C.A. § 254.  It is clear that normal commutes are excluded from minimum wage and overtime compensation.  *See, e.g., Ralph v. Tidewater Construction Co.*, 361 F.2d 806, 809 (4th Cir. 1966).  Thus, where an employee commuted on his employer's bus, but no "work" was performed during the commute, his time was not compensable under federal law, even if occasional instructions were given to the workers during the travel time.  *Dolan v. Project Construction Corp.*, 558 F. Supp. 1308, 1311 (D. Colo. 1983).  Similarly, where seasonal farm workers' commute was two to two-and-a-half hours each way on an employer's bus, but the workers performed no work prior to or while riding on the buses, the commute was not compensable under federal law.  *Vega v. Gasper*, 36 F.3d 417, 425 (5th Cir. 1994).  Courts that have denied FLSA claims for travel time also have emphasized that even if the employer provided transportation, the employees were free to take their own transportation if they preferred.  *See, e.g., id.* at 425; *Tanaka v. Richard K. W. Tom, Inc.*, 299 F. Supp. 732, 735 (D. Haw. 1969).

While a plain reading of the Maryland regulation appears to disfavor the compensability of normal commuting time, this case arguably presents a special situation.  In typical FLSA

cases, the workers commute from their normal places of residence to worksites, and correspondingly have choices of where to live and how to travel to work.  Here, the plaintiffs did not have those choices, as the defendants determined where the plaintiffs lived and provided the plaintiffs the transportation to their worksites.  Indeed, some of the plaintiffs were allowed to live onsite, and correspondingly were able to work more hours and did not have to endure the four hours of travel time.  The plaintiffs had no choice as to where they lived or how many hours they worked, but those living in Daphne argue they would have preferred to live closer.

The plaintiffs' motion for summary judgment on the travel time claim will nonetheless be denied, because whether the plaintiffs' commute was during "regular work hours" and whether the plaintiffs were "on duty" during the commute are mixed questions of law and fact.  Other than providing affidavits stating where they worked and how long their commutes were, the plaintiffs have not provided specific evidence regarding whether they were "on duty" during their commutes or whether the commutes occurred during regular work hours.  The defendants claim the plaintiffs' regular work hours were from 7:00 a.m. to 4:00 p.m. and that they were not on duty at 5:00 a.m.  Without something more defining the meaning of "regular work hours" or "on duty", there exists a dispute of material fact that the fact-finder must decide.


C.      On-Call Time

Several of the plaintiffs claim they should be compensated for their time waiting "on-call" for the days following October 22, 2005.  Some of the plaintiffs claim MFC urged them to stay in the Gulf Coast region because more work might become available.  In their opposition brief, the defendants contend they did not ask the men to wait and that the plaintiffs were offered

the option to return to Maryland on a bus paid for by the defendants.

The plaintiffs again cite Maryland Regulation 09.12.41.10 and claim they were "on duty" as they were waiting for work.  As with the travel time issue, no case law appears to exist interpreting that Maryland regulation.  While the plaintiffs do not base their on-call claim on the FLSA, the federal cases interpreting the issue make the familiar distinction between being "engaged to be waiting", which is compensable, and "waiting to be engaged", which is not.  *See Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944); 29 C.F.R. § 785.14.  In making the distinction, courts examine several factors, including: the agreement of the parties, the nature of services provided, where the plaintiff is waiting, and, most importantly, whether the time spent waiting is primarily for the employer's benefit or for the employee's benefit.  *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944), *reh'g. denied*, 323 U.S. 818 (1945); 29 C.F.R. § 785.14-.15.

Several of the plaintiffs have attached affidavits claiming Fredis Canales assured the plaintiffs there would be work on the days following October 21, 2005.  (*See* Pl.'s Mem. at App., Luna Decl. at ¶ ¶ 12-14; Campos Resp. to Miguel Canales Interrogs. at # 4.)  Others of the plaintiffs, however, did not wait for any work, were transported home on October 24, 2005, and do not make claims for on-call time.  (*See id.*, Torres Resp. to Miguel Canales Interrogs. at # 14.)  The defendants have attached no affidavits or depositions specifically refuting the plaintiffs' claim.  In their opposition, the defendants state "Mr. Canales has stated that he did not ask these men to wait and that there was no further work for them to perform."  (Def.'s Opp. Mem. at 6.)  Unfortunately, the defendants do not cite where Mr. Canales made that statement, and a review of the record does not uncover any such statement made by the defendants under oath.  When asked at oral argument to cite to a specific refutation of the plaintiffs' claims on the record,

16

MFC's attorney was unable to do so.[11]

Nevertheless, although it is a close question, I will deny the plaintiffs' motion on the "on-call" issue. While the defendants have not specifically addressed the issue of on-call time, the plaintiffs' affidavits are also not specific enough to establish that the plaintiffs were engaged to be waiting as opposed to waiting to be engaged. *See* Pl.'s Mem. at App. Luna Decl. at ¶ 13 ("There was no security about the continuation of the work, but Fredis kept saying that there might be more work and to keep waiting until Monday.") The issue is best decided at trial, where the plaintiffs will be available to specify exactly what the defendants said with regard to on-call time. Given that the Maryland law on the issue is undeveloped and that the plaintiffs' affidavits lack the necessary specificity, a material dispute of fact exists as to the issue of on-call time.

D.     Additional Statutory Damages

Under Maryland law, employers are required to pay promptly all wages due for work that the employee performed and, if the wages have not been paid within two weeks of the normal time of payment, the employee may bring an action against the employer to recover unpaid wages. Md. Code Ann., Lab. & Empl. § 3-507.1(a) (2006). If "a court finds that an employer withheld the wage of an employee... and not as a result of a bona fide dispute, the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs." *Id.* at § 3-507.1(b). Here, the plaintiffs claim there is no bona fide dispute that the defendants improperly accounted for the plaintiffs' hours worked, travel time, and on-call time.

---

[11] In their answer to the plaintiffs' amended complaint, the defendants did generally deny the allegation that the plaintiffs were told to wait for work after October 22. (Def.'s Am. Answer at ¶ 22.)

Accordingly, they seek treble damages, attorney's fees, and costs.

The Maryland courts have explained the meaning of a bona fide dispute:

> All of the definitions articulated by the courts focus really on whether the party making or resisting the claim has a good faith basis for doing so, whether there is a legitimate dispute over the validity of the claim or the amount that is owing. The issue is not whether a party acted fraudulently; fraud is certainly inconsistent with the notion of "bona fide" or "good faith," but it is not required to establish an absence of good faith. The question, simply, is whether there was sufficient evidence adduced to permit a trier of fact to determine that [the employer] did not act in good faith when it refused to pay ... [the employee] ...

*Admiral Mortgage, Inc. v. Cooper*, 357 Md. 533, 543, 75 A.2d 1026 (D. Md. 2000).   The determination of a bona fide dispute is one that is generally left for the jury and not the judge, though summary judgment is still appropriate where sufficient evidence as to the bona fide dispute does not exist. *Gresham v. Lumberman's Mut. Casualty Co.*, 426 F. Supp. 2d 321, 325 (D. Md. 2005) (quoting *Baltimore Harbor Charters Ltd. v. Ayd*, 365 Md. 366, 396, 780 A.2d 303 (2001) ("[t]he existence of a bona fide dispute under § 3-507 is a question of fact left for resolution by the jury, not the trial judge.")  In examining the issue, however, the courts have drawn a distinction between the treble damages provision and the attorneys' fees and costs provision; with the former being a determination left to juries and the latter left to judges. *Cooper*, 357 Md. at 547.  The rationale for the distinction rests in part on the fact that there is no set amount of additional damages mandated by §3-507.1(b), which only states that plaintiff may be awarded an amount "not exceeding three times the wage." *See id.*  Pursuant to Maryland law, I will decide whether a bona fide dispute exists under §3-507, but will leave to the jury the amount of additional damages due to the plaintiffs.

Here, I find there is no bona fide dispute between the parties regarding the plaintiffs'

work time and overtime.  The plaintiffs sue for $47,585.50 in work time and overtime.  Zipin's

report acknowledged that the defendants owed the plaintiffs $44,159.50.  In the several months

since Zipin's report was issued, the defendants have not paid any portion of the $44,159,50 their

own expert acknowledges they owe.  While MFC first took the position it was not obligated to

pay the plaintiffs overtime, MFC backed away from that position at oral argument, and there is

now no dispute that overtime is owed to the plaintiffs.  The only issue regarding the plaintiffs'

work time and overtime is whether the defendants are entitled to offset the plaintiffs' wages.

But, as noted above, because the defendants have provided absolutely no documentation of the

cost of the offsets, and because the Maryland regulation clearly requires written authorization for

the deduction of offsets, I find as a matter of law that MFC had no good faith basis to believe it

was entitled to offsets.  That MFC should have known it was not entitled to offsets is further

buttressed by Zipin's decision not to offset the plaintiffs' wages.  Further, because Zipin had an

opportunity to review Kresslein's supplemental expert report and Aguilar's and Marroquin's

timesheets, but declined to do so, MFC had no good faith basis to believe that Kresslein's

estimation of damages was incorrect.  Accordingly, I will find there is no bona fide dispute

regarding plaintiffs' entitlement to the $47,585.50 that Kresslein calculated plaintiffs were owed.


I cannot find, however, as a matter of law, that there is no bona fide dispute regarding

travel time and on-call time.  The Maryland Regulation that governs compensable time does not

clearly state when travel time and on-call time are compensable, and no developed body of case

law interpreting the Regulation exists.  It was potentially reasonable for the defendants to think

19

that travel time and on-call time in the particular circumstances of this case might not need to be paid, as their expert has since Zipin opined.  (*See* Zipin Rep. at 2-3.)  Accordingly, I will not grant summary judgment on these issues.

III     Jose Sales' Motion for Summary Judgment

In addition to the wages Sales claims he is owed from his time in the Gulf Coast Region, Sales alleges that MFC owes him $2,392.50 in wages from work in Philadelphia, Boston, North Carolina, and at the Canales family home.  (Sales Mot. at Ex. 1, Sales Decl. at ¶ 7.)  Sales claims that MFC agreed to pay Sales $10 per hour for the work he performed in the various cities.  (*Id.* at ¶ 5.)  In support of his motion, Sales attaches time records that he contemporaneously kept while working.  (Sales Mot. at Ex. 1.)  He also attaches an affidavit swearing that he was paid only $1000.00 for the work he performed before going to the Gulf Coast and that "Michael Canales assured me that if I came and worked in Mississippi, I would eventually get paid everything I was owed."  (*Id.* at Ex. 1, Sales Decl. at ¶¶ 8-9.)  Plaintiffs' expert, Kresslein, examined Sales's time records and determined that he was owed $3,392.50 in work time and overtime but was only paid $1,000.00.[12]  MFC's expert, Zipin, stated that any work performed by Sales prior to Mississippi clean up work was "beyond the scope of my retention and this Expert report."  (Pl.'s Mem. at App., Zipin Rep. at 5.)

Maryland law has established a burden shifting framework under the Maryland wage collection statutes.  In *Turner v. Human Genome Science, Inc.*, 292 F. Supp. 2d 738 (Md. 2003),

---

[12] Sales makes no claim for travel time or on-call time for the work performed before the Gulf Coast region.

the court stated that under the FLSA and the Maryland Wage and Hour Law, employees have the initial burden of proving they worked a certain numbers of hours, which can be proved "through an employee's testimony giving his recollection of hours worked." *Turner*, 292 F. Supp. 2d at 748 (citing *Donovan v. Kentwood Dev. Co., Inc.*, 549 F. Supp. 480, 485 (D. Md. 1982).  The burden is then shifted to the defendants to "come forward with evidence of the exact number of hours worked or with evidence to negate the reasonableness of the inference to be drawn from the plaintiff's evidence." *Turner*, 292 F. Supp. 2d at 748 (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687, 66 S. Ct. 1187 (1946)).

Sales satisfied his initial burden of production.  Not only did he provide sworn testimony regarding his work hours, Sales also provided time records he claims he kept contemporaneously.  The burden then shifts to the defendants.  MFC has not provided any records or evidence to "negate the reasonableness of the inference" of the plaintiff's testimony and records.  Indeed, MFC's expert admitted he did not attempt to calculate what Sales was owed because he was not provided daily time sheets.  (Pl.'s Mem. at App., Zipin Rep. at 5.)  MFC's only claim of a dispute of material fact is MFC's statement that they "dispute the hours submitted by Mr. Sales for work performed in North Carolina and Philadelphia."  (Def.'s Opp. Mem. at 2.)  No specific evidence was cited, however, supporting MFC's basis for the dispute, and Rule 56(e) requires that a defendant do more than "rest upon the mere allegations or denials of the adverse party's pleadings."  Fed. R. Civ. P. 56(e).  Without documentary evidence establishing the hours Sales worked, MFC has not established a dispute of material fact.  Accordingly, I will grant Sales's motion for summary judgment for $2,392.50.

Sales also has moved to have his damages trebled under Md. Code Ann., Lab. & Empl. §

3-507.1(a) (2006) arguing that the defendants have not established a bona fide dispute exists regarding Sales' wages.  I agree with Sales that no bona fide dispute exists regarding the money he is due.  Under Maryland law, an employer is required to keep for at least three years a record of: (1) the name, address, and occupation of each employee; (2) the rate of pay of each employee;

(3) the amount that is paid each pay period to each employee; (4) the hours that each employee works each day and workweek; and (5) other information that the Commissioner requires, by regulation, as reasonable to enforce this subtitle.  Md. Code Ann., Lab. & Empl. § 3-424 (2006).  MFC has either not properly kept such records, in violation of Maryland law, or has refused to submit those records to the court.  In either event, MFC knew or should have known it could not produce documentary evidence disputing Sales's testimony regarding his hours.  Accordingly, I find there is no bona fide dispute regarding the wages Sales is owed for work performed for MFC prior to the Gulf Coast.  The exact amount of additional damages (up to treble damages) must be determined by the jury.  Again, I will determine attorneys' fees and costs at the end of the case.


III     Alicia Canales's Motion for Summary Judgment

        Ms. Canales has filed a motion for summary judgment requesting that she be dismissed from the case.  Ms. Canales has been sued individually and as an officer of MFC, but claims she was not an officer of MFC and made no decisions regarding the plaintiffs in this case.  In her deposition, Ms. Canales testified MFC was her husband and sons' business and she has never been employed by or received compensation from MFC.  (MFC Mem. at Ex. 1., Alicia Canales

Dep. at 12-13.)  She further testified she has never been on site at any of the MFC projects.  (*Id* at 15.)  She does testify, however, that Fredis and Miguel Canales asked her to write some checks for the plaintiffs, because her husband and son were in Mississippi and away from the company checkbook.  (*Id.* at Ex. 2, Alicia Canales Dep. at 18-19.)  Ms. Canales claims that she did not examine the time sheets and made no calculations of how much the plaintiffs were owed, but merely wrote the checks for amounts her husband and son said were due.  (*Id.*)  Because she was not in a decision-making position in MFC generally or with respect to the plaintiffs specifically and was not an employee or officer of MFC, Ms. Canales argues she should not be considered an employer of the plaintiffs.

The plaintiffs claim that MFC observes almost no corporate formalities and that Ms. Canales should be treated as a director of MFC and, thus, an employer of the plaintiffs.  For instance, the plaintiffs note that MFC does not track its operating profits and losses and co-mingles corporate and family funds.  (*See* Pl.'s Mem. at App., Miguel Canales Dep. at 22-23, 60.)  The plaintiffs also claim that Ms. Canales regularly acted on behalf of MFC by writing paychecks to the plaintiffs and by wiring money to her husband and son while they were in Mississippi.

I will grant Ms. Canales's motion for summary judgment.  Under Maryland law, an employer "includes any person who employs an individual in the State," (Md. Code Ann., Lab. & Empl. §3-501(b) (2006)) or "who acts directly or indirectly in the interest of another employer with an employee."  (Md. Code Ann., Lab. & Empl. §3-401 (2006)).  Here, Ms. Canales cannot be considered an employer even under an expansive reading of the term's definition.  Ms. Canales did not hire the plaintiffs, did not decide their wages, did not direct the plaintiffs in any

of their work, and was never in the Gulf Coast region.  Ms. Canales testified that she is not an

employee or director of MFC and has no decision-making responsibilities in the corporation.

The extent of her involvement with the plaintiffs was limited to writing checks on an apparently

ad-hoc basis to the plaintiffs on behalf of MFC when Miguel and Fredis Canales did not have

access to the MFC checkbooks.  The mere fact that Ms. Canales wrote some checks does not

establish that she was the plaintiffs' employer.

The plaintiffs alternatively claim MFC is the alter ego of the entire Canales family.

While it does appear that Fredis and Miguel Canales may well have disregarded corporate

formalities, which may later necessitate piercing the corporate veil, the plaintiffs have not

established Alicia Canales's connection to MFC.  The plaintiffs claim that courts regularly pierce

the corporate veil to reach individuals who are not officers, directors, employees, or

shareholders.  While it is true that some jurisdictions have allowed suit against individuals who

are not technically named directors or employees of the corporation, those cases involve

instances in which individuals exercise sufficient control of the corporation to be considered de

facto corporate officers.  *See e.g., Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044,

1051 (2d Cir. 1997).  Here, discovery has revealed no facts demonstrating that Ms. Canales

exercised control over the corporation.  On the contrary, she testified she was not involved in the

running of the corporation in any way.  On the record before me, I cannot find that Ms. Canales

was an employer of the plaintiffs and will grant her motion for summary judgment.


IV      Defendant URI's Motion for Summary Judgment

Under an unusual procedural posture, the defendant URI has filed a motion for summary

judgment against the cross defendants MFC and the individual defendants.  URI's Cross-Claim

states:

> 2. Without admitting any liability, if it determined (sic) that URI is liable to the Plaintiffs
> in any respect, such liability is merely imputed and, as a result, any liability for which
> URI may be liable are chargeable to the Defendants Canales and MFC, and URI is
> entitled to indemnification from the defendants, together with costs. ...
>
> 4. Without admitting any liability, defendant URI demands contribution from defendants
> Miguel Canales, MFC General Contractors, Inc., Fredis Fermin Canales and Alicia
> Canales, with respect to any and all damages which may be assessed against defendant
> URI and in favor of Plaintiffs, together with costs.

(Def.'s Answer and Cross-Claim at 16-17.)  URI has recently submitted a settlement agreement

with the plaintiffs in which URI has agreed to pay the plaintiffs $100,000 and the plaintiffs have

agreed to release URI from any claims.  Although the $100,000 has not yet been paid, URI is

nonetheless seeking indemnification on the settlement from MFC on an express indemnity

contract theory, or in the alternative, on an implied-in-law indemnity theory.

On June 14, 2002, URI and MFC entered into a "Hold-Harmless and Non-Competition

Agreement" (hereinafter "Hold Harmless Agreement") where the parties noted their intent to be

legally bound pursuant to the Pennsylvania Written Obligations Act.  (*See* URI Mem. at Ex. 1.)

The Agreement stated:

> Contractor hereby agrees to indemnify and hold URI its successors or assigns harmless
> from any and all claims, liabilities, loss, interest, penalty, deficiency (including
> reasonable attorneys' fees and costs and expenses) incident to or arising out of any work
> performed as a subcontractor of URI or any claim by any employee of Contractor of any
> kind.  In the event that there is any dispute regarding Contractors responsibility under and
> pursuant to this agreement, the parties agree said dispute shall be heard in the Court of
> Common Pleas of Montgomery County, Pennsylvania which Court shall have jurisdiction
> over all matters relating to and arising out of this Agreement.

(*Id.*)  URI argues that the clause "incident to or arising out of any work performed as a

25

subcontractor of URI or any claim by any employee of Contract or of any kind" plainly covers any and all claims from the plaintiffs in this case.  Accordingly, URI argues that MFC should indemnify it for any settlement it reaches in this case.

Alternatively, URI argues that it is entitled to summary judgment from MFC on an implied-at-law indemnification claim.  Indemnification at law is appropriate when "one party's role is so passive or secondary that it would be inequitable to require that party to sustain any of the burden of judgment."  *Canjura v. Able Service Contractors, Inc.*, 866 F. Supp. 258, 261 (D. Md. 1994).  According to URI, MFC was wholly in charge of every aspect of managing the plaintiffs' work and the plaintiffs had no relationship with URI.  URI contends "[b]ecause MFC recruited and hired the Plaintiffs, came to agreements with them regarding overtime and meals, tendered bad checks and allegedly failed to pay its employees, it would be inequitable for URI to bear the brunt of this conduct by having to pay to settle the suit at bar."  (Def.'s Mem. at 8.) Miguel Canales testified that URI and MFC agreed upon a rate of labor ($20 per hour for non-skilled workers and $25 per hour for skilled workers), and MFC does not dispute that URI  paid its obligations to MFC in full.  URI argues it was MFC's responsibility to pay the plaintiffs, which they contracted to do at a rate of $10 per hour.  URI further argues that the plaintiffs' second amended complaint alleges no wrongdoing on the part of URI because it does not allege that URI was actively involved in recruiting, hiring, setting the terms of employment, or paying the plaintiffs.

At the motions hearing, MFC conceded the settlement agreement appeared fair.  MFC argues, however, that URI is not entitled to summary judgment because there are disputed material facts in the underlying case with the plaintiffs.  In particular, MFC disputes much of the

plaintiffs' claims of hours worked and their entitlement to travel time and on-call time.

According to MFC's expert, the plaintiffs are owed no more than $44,159.50, and "URI has

chosen to settle with the Plaintiffs for a figure that does not represent the amount of wages which

the Plaintiffs are owed."[13]  (Def.'s Opp. Mem. at 5.)  MFC thus argues URI is voluntarily settling

the case for a value above what the case is worth and MFC should not be held responsible for

indemnification.  MFC also argues that the Hold-Harmless Agreement, which was signed in

2002, was only intended to cover one job and that the court lacks jurisdiction over the

Agreement.  It alternatively argues that URI should not be entitled to indemnification at law.

 URI probably will prevail on both of its indemnification theories.  The Hold Harmless

Agreement does appear to cover the claims at issue here because the Agreement covers "*any and

all claims*, liabilities, loss, ... incident to or arising out of any work performed as a subcontractor

of URI or by *any employee* of Contractor *of any kind*."  (URI Mem. at Ex. 1) (emphasis added).

On its face, the Agreement's broad coverage provisions would require MFC to indemnify URI.

 MFC makes two arguments why the Agreement should not apply.  First, MFC argues this

court does not have jurisdiction to hear the indemnity claim because the Agreement provides that

all disputes under the Agreement are to be heard in the Court of Common Pleas of Montgomery

County, Pennsylvania.  (*Id.*)  MFC's argument fails for two reasons. Lack of personal

jurisdiction and improper venue are defenses that must be raised at the outset of litigation in a

motion to dismiss.  *See* Fed. R. Civ. P. 12(b).  MFC only raised the jurisdictional argument in its

opposition to the motion for summary judgment, and thus has waived the defense.  Even if MFC

---

[13] URI responds that it "decided to settle its claims with Plaintiffs, rather than risk being
held jointly and severally liable for at least $132,478.50, the undisputed amount of wages due
from MFC to Plaintiffs trebled" as called for by Maryland law.  (Def.'s Reply at 3.)

had timely raised its argument, this court would still have discretion to exercise supplemental

jurisdiction over the indemnification claim.  Given that the indemnification issue is fully briefed

and that the grant of indemnification will depend on the outcome of the underlying lawsuit, it

makes sense for all the issues in the case to be heard in the same court.  Taking into account the

convenience to the parties and considerations of judicial economy, *see Shanaghan v. Cahill*, 58

F.3d 106, 110 (4th Cir. 1995), I will exercise supplemental jurisdiction.

Second, MFC argues, both in its written opposition and in the oral argument, that the

Hold Harmless Agreement should not apply to the Gulf Coast plaintiffs because the Agreement

terminated with a project in 2002.  While it is true that the Agreement was signed on September

8, 2002, there is nothing in the Agreement to indicate that it was intended to apply to only one

job.  A plain reading of the Agreement reveals that the Agreement applied to claims arising from

"any work" MFC performed as a subcontractor of URI.  Indeed, the fact that the Agreement does

not refer to a specific project suggests that it was intended to cover more than one job.  Further,

MFC has not attached any affidavits from its employees regarding their understanding of the

Agreement at the time it was signed, while URI attached an affidavit from its President affirming

it was the intent of the parties that the Hold Harmless Agreement would attach to all work MFC

performed as a subcontract of URI's.  (URI's Reply at Ex. 1, Rogers Aff. at ¶ ¶ 3-5.)  Thus, it

appears the Agreement covers the work performed in the Gulf Coast.

Even if the Hold Harmless Agreement did not require MFC to indemnify URI, URI

would likely be entitled to implied indemnity.  The law requires indemnity when one party is

unjustly enriched at the expense of another by the other party's discharge of liability.  *Franklin

v. Morrison*, 350 Md. 144, 154, 711 A.2d 177, 182 (1998) (quoting Restatement (Second) of

Torts § 886B cmt. c.)  Here, it appears that MFC, and not URI, should be held to bear responsibility for plaintiffs' claims.  The plaintiffs' claims arise out of MFC's alleged failure to pay overtime, travel time, and on-call time.  There is no dispute in this case that it was MFC's, and not URI's, responsibility to pay the plaintiffs.  Indeed, it was MFC, and not URI, that set the plaintiffs' wages and hired the plaintiffs.  There is also no dispute that URI paid MFC the agreed rate for the labor.  URI's responsibility in this case is established through the joint and several liability doctrine, and not through any direct liability to the plaintiffs.  Accordingly, it appears that URI would also prevail under an indemnity-at-law theory.

Notwithstanding the fact it appears URI ultimately will prevail on its indemnification theories, URI's motion will be denied without prejudice at this time.  In Maryland, ordinarily, a right to contribution does not accrue before plaintiffs have been paid the entire amount to which they are entitled.  *See Wassel v. Eglowsky*, 399 F. Supp. 1330, 1370-71 (D. Md. 1975); *Associated Trans. v. Bonoumo*, 191 Md. 442, 62 A.2d 281, 283 (1948) (applying a prior version of the Uniform Contribution Among  Tortfeasors Act).  In a typical indemnity or contribution claim, the claim against the cross defendant is determined after liability is established.  While settling defendants can successfully sue nonsettling defendants for contribution if the settling defendant paid more than his fair share in the settlement, URI has not cited case law where a co-defendant settles with the plaintiffs and then, before liability is established, seeks to have the entire settlement amount indemnified.  Thus, while it appears URI ultimately will be successful in its indemnification motion, its motion for summary judgment will be denied without prejudice. It may be filed again when liability and damages are fully established.

A separate order follows.


August 8, 2007                                            /s/
Date                                           Catherine C. Blake
                                               United States District Judge